**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARIA GORRASI | * | |
| | * | Civil Action No. CCB-20-2389 |
| v. | * | |
| | * | |
| ALEX M. AZAR II, *Secretary of* | * | |
| *U.S. Department of Health and Human* | * | |
| *Services, National Institutes of Health* | * | |
| | * | |
| | * | |
| | ***** | |

## MEMORANDUM

Presently pending and ready for review in this employment discrimination case is a

motion to dismiss or for summary judgment filed by defendant Alex Azar, Secretary of the U.S.

Department of Health and Human Services ("the Agency"). (ECF No. 21). The issues have been

briefed, and no oral argument is necessary. Local Rule 105.6 (D. Md. 2021). For the following

reasons, the motion will be granted.

## BACKGROUND

The plaintiff, Ms. Maria Gorrasi, has worked at the National Institutes of Health as a

Human Resources Specialist since 1995, now at the GS-14 level. (ECF 6, Am. Compl. ¶¶ 3, 9).

She asserts that she is a member of protected racial[1] and national origin[2] groups, is over 40 years

old, and has a hearing impairment and diabetes. (*Id.* ¶ 8).

---

[1] Latina (ECF 21-9, Exhibit H, Equal Employment Opportunity Counselor's Pre-Compl. Report at 3); White (ECF 21-10, Exhibit I, Formal Compl. of Discrimination in the Federal Government at 2); Hispanic (ECF 21-13, Exhibit L, Equal Employment Opportunity Counselor's Pre-Compl. Report at 3; ECF 21-14, Exhibit M, Formal Individual Compl. Form for Employment Discrimination at 4).

[2] Hispanic (ECF 21-3, Exhibit B, Equal Employment Opportunity Counselor's Pre-Compl. Report at 8; Exhibit B, Formal EEO Compl. at 2); Latina (ECF 21-10, Exhibit I, Formal Compl. of Discrimination in the Federal Government at 2); Italian/Argentinian American (ECF 21-13, Exhibit L, Equal Employment Opportunity Counselor's Pre-Compl. Report at 3).

Ms. Gorrasi has filed several Equal Employment Opportunity complaints predating the current action, including non-selection complaints in 2008 and 2012 and harassment complaints in 2012 and 2014. (*Id*. ¶ 11). She filed the 2012 non-selection complaint after she was not chosen to be the Deputy Director of NIH's Workforce Relations Division (WRD), losing out to Ms. Beth Chandler. (*Id*. ¶ 35). This lawsuit alleges several instances of discrimination in 2015, 2016, 2018, and 2019.

### Fall 2015: Proposed suspension and non-selection as Acting Deputy Director

The first action in question concerns proposed workplace discipline. On September 22, 2015, Ms. Gorrasi learned that her first-level supervisor, Mr. Roman Lesiw, had proposed that she be suspended for seven days. (ECF 21-6, Decision at 4; ECF 6 ¶ 27). Mr. Lesiw issued the proposed discipline because he believed Ms. Gorrasi had acted unprofessionally by attempting to influence the recommendation of a colleague at NIH Workforce Relations, Mr. Tim Spratley. (ECF 21-6 at 4). Mr. Spratley was advising a client regarding a difficult employee, and Ms. Gorrasi knew the sister of the employee at issue and told Mr. Spratley that the employee had attorneys in her family. (*Id*.). Mr. Spratley interpreted this as a threat that the employee would sue and, believing Ms. Gorrasi's statements to be inappropriate, reported them to his supervisor. Mr. Lesiw believed that Ms. Gorrasi's comments were "unwelcome, inappropriate, and intended to influence the Agency's human resources office with regard to a proposed disciplinary action against an employee with whom [Ms. Gorrasi] had a personal relationship." (*Id*. at 18–19). Ms. Gorrasi described this proposed suspension as "designed to preclude her promotion to the GS-15 grade" and alleges that the Agency failed to investigate the matter. (ECF 6 ¶ 30).

But Ms. Gorrasi never served the suspension. Ms. Chandler was the deciding official for the proposed suspension, and she decided not to uphold it after finding technical problems and

insufficient support for the disciplinary measure. (ECF 21-6 at 4). Ms. Gorrasi was not suspended, and the discipline proposal letter was not put in Ms. Gorrasi's official personnel file. (*Id.*). Ms. Chandler notified Ms. Gorrasi of her decision in April 2016. (*Id.*).

A second instance of alleged discrimination also occurred that fall. On September 17, 2015, Ms. Chandler emailed her GS-14-level employees — including Ms. Gorrasi — to advertise a vacancy in the Acting Deputy Director position at WRD. (*Id.*). Realizing Ms. Gorrasi was on leave at the time, Ms. Chandler also contacted Ms. Gorrasi directly and extended the response deadline. (*Id.*; ECF 6 ¶¶ 19–21). Ms. Gorrasi expressed her interest in the position on September 21, 2015. (ECF 21-6 at 4).

Ms. Chandler later chose Ms. Deborah Coelho to be Acting Deputy Director. (*Id.* at 4–5; ECF 6 ¶¶ 22–26). Ms. Chandler stated that Ms. Coelho "demonstrated leadership abilities [. . .] and the ability to work with challenging customers" and that Coelho "had shown an ability to be strategic and innovative [and had] a Branch and Division wide view of our work and customers." (ECF 21-6 at 4–5). Ms. Gorrasi notes that Ms. Coelho is younger than Gorrasi and is white and "of Jewish descent" and had had a shorter career in HR and at NIH WRD compared to Ms. Gorrasi's (ECF 6 ¶¶ 23–24; ECF 11-3, Aff. ¶ 25).

### Spring and Summer 2016: Yelling, involuntary reassignment, and non-selection for full Deputy Director

Ms. Gorrasi cites three instances of employment discrimination from the following spring and summer: her supervisor yelling at her, her involuntary reassignment to a non-supervisory position, and her non-selection for the full Deputy Director position.

First, on March 31, 2016, Mr. Lesiw raised his voice at Ms. Gorrasi during a conference call. (ECF 6 ¶ 17). Ms. Gorrasi alleges that this was part of a "regular pattern of hostility" from Mr. Lesiw directed at Ms. Gorrasi, a pattern that management did not prevent, investigate, or

correct. (ECF 6 ¶¶ 17–18). She said that Mr. Lesiw raised his voice at her monthly or, at worst, every few weeks, but it had not happened in the past few months. (ECF 11-3, Aff. ¶ 32(b)).

During that March 2016 conversation, Mr. Lesiw was upset with Ms. Gorrasi because he believed her team had failed to take several actions in advising a client, leading to the client's grave displeasure. (ECF 21-6 at 5). Ms. Gorrasi said that her supervisee, rather than she, was responsible for the mistake, and she later suggested Ms. Eloisa Cabanayan as a witness to the incident. (ECF 11-3, Aff. ¶¶ 32(b), 32(e)). Ms. Cabanayan said that Ms. Gorrasi also spoke in a very loud voice that day and dominated the conversation with Mr. Lesiw. (ECF 21-6 at 5). When Ms. Gorrasi complained to Ms. Chandler about the call with Mr. Lesiw, Ms. Chandler decided to counsel Mr. Lesiw and advised him that he could not raise his voice at employees and that he needed to act like a leader and behave appropriately. (*Id*. at 5–6).

Second, Ms. Gorrasi was involuntarily reassigned to a non-supervisory position the following month; she learned of the change on April 19, 2016. (ECF 11-2). Ms. Gorrasi characterizes this measure as an attempt by management to diminish her candidacy for the Deputy Director position. (ECF 6 ¶ 31).

Third, on June 30, 2016, Ms. Gorrasi learned that she was not selected for the full-time Deputy Director position. (ECF 21-5, Exhibit D at 2). Ms. Chandler was the selecting officer and assembled three-person panels for two rounds of interviews, considering Ms. Gorrasi, Ms. Coelho, and a third candidate.

Ms. Gorrasi believed the first-round interview went well due to her decades of federal government employment. (ECF 11-3, Suppl. Aff. ¶ 6). The interviewers disagreed: Two of the three "did not believe that [Ms. Gorrasi's] interview demonstrated that she met the needs of the position," and they cited deficiencies in her strategic thinking and transactional or operational,

rather than strategic, answers to problem-solving questions posed during the interview. (ECF 21-6 at 6). They did not recommend that Ms. Gorrasi proceed to round two, but Ms. Chandler directed (pursuant to an earlier EEO settlement agreement) that she should advance past the initial cut. (ECF 21-6 at 6–7; ECF 11-3, Suppl. Aff. ¶ 2).

Ms. Gorrasi believed her second-round interview went well and said she believed she "answered all the questions accurately and had extensive knowledge regarding the HR questions posed." (ECF 11-3, Suppl. Aff. ¶ 10). Once again, the panel (Chandler and two new interviewers) disagreed. Their notes from the interview revealed that Ms. Gorrasi did not answer any questions directly; did not tie her role to other entities within NIH; and did not "articulate an understanding of the importance of knowing the customer perspective, considering the political climate, [. . .] thinking strategically," and learning the culture and dynamics of the entire organization. (ECF 21-6 at 6–7). Interviewers noted that she had technical expertise and had initially impressive credentials, but that the interview undermined her initially strong candidacy because she demonstrated a "lack of knowledge as to what the Deputy Director would do" and failed to answer "basic leadership and scenario type questions." (*Id.*).  In contrast, all three interviewers were impressed with Ms. Coelho's interview: She demonstrated a strong understanding of employee/labor relations, thought strategically, understood the customer perspective, had high emotional intelligence, understood the Deputy role, provided specific examples of demonstrated leadership and innovative problem solving and crisis management, and was ready for the role immediately. (*Id.* at 7–8). One interviewer believed the difference between Ms. Coelho's interview and Ms. Gorrasi's interview was like "night and day." (*Id.*). Ms. Coelho won the full Deputy Director position. (*Id.*).

Ms. Gorrasi filed an EEO complaint regarding the events from fall 2015 through summer 2016 (Agency Case No. HHS-NIH-OD-063-16). She made initial informal contact with an EEO counselor on November 11, 2015. (ECF 21-3, Exhibit B). The counselor filed a pre-complaint report on February 12, 2016. (*Id.*). By then, Ms. Gorrasi had filed her formal complaint on February 9, 2016; this complaint included her 2015 proposed suspension and her non-selection (specifically, being denied the opportunity to compete) for Acting Deputy Director. (ECF 21-4, Exhibit C, Formal Compl. of Discrimination in the Federal Government).

Ms. Gorrasi amended the initial complaint several times. On April 12, 2016, she amended the complaint to include the heated March 31 conversation with Mr. Lesiw. (ECF 21-5, Exhibit D at 2). On May 26, she submitted a hand-written note attempting to amend her complaint to include her April 19 involuntary reassignment to a non-supervisory role. (ECF 11-2). On July 7, she amended the complaint to include her June 30 non-selection for the Deputy Director role. In June 2016, Ms. Gorrasi noted in an EEO investigation affidavit that she had submitted the April 12 amendment regarding Mr. Lesiw's yelling. (ECF 11-3, ¶ 32(b)). Her later supplemental affidavit in support of her July 7 amendment makes no mention of her April 19 attempted amendment, though it does mention the involuntary reassignment itself. (ECF 11-3, ¶ 11). EEO acknowledged her formal complaint and her April 12 and July 7 amendments in its July 12 receipt, but there is no mention of the April 19 note about her involuntary reassignment. (ECF 21-5, Exhibit D). An administrative judge adjudicated the claim and issued a decision finding for the Agency on March 28, 2019. (ECF 21-6, Exhibit E, Decision). The record does not indicate that Ms. Gorrasi inquired as to the status of the involuntary assignment amendment or why it was not recognized as an issue in the case.

**2018 and 2019: Non-selections for Acting Deputy Director, Director, Team Lead, and Deputy Director**

Ms. Gorrasi opened two additional EEO cases dealing with non-selections in 2018 (Agency Case No. HHS-NIH-OD-063) and 2019 (Agency Case No. HHS-NIH-OD-063-19).

The second EEO complaint arose in mid-March of 2018, when Ms. Gorrasi learned she had not been selected to be Acting Deputy Director of NIH WRD. (ECF 21-9, Exhibit H, Equal Employment Opportunity Counselor's Pre-Complaint Report). At this point, Ms. Coelho had been elevated to Acting Director, and she chose Ms. Jenna Moran for the acting deputy position because (1) Ms. Moran gave more substantive answers than Ms. Gorrasi to four application questions; (2) Ms. Gorrasi's application had typos; and (3) Ms. Gorrasi did not have enough "benefits" experience in her answers. (*Id*. § E). Ms. Gorrasi told the EEO counselor that there were no typos and that she had relevant benefits experience. (*Id*. § E). Ms. Gorrasi submitted an April 30 formal complaint alleging discrimination based on "race (white), color (olive), national origin (Latina), Age (12/1962), Sex (female), religion ([C]atholic), disability (physical), and reprisal (Prior EEO Activity)." (ECF 21-11, Exhibit J; see ECF 21-10, Formal Individual Compl. Form for Employment Discrimination § 11). The EEO office acknowledged receipt on May 29, 2018. (ECF 21-11).

The third EEO complaint arose in 2019, after three more non-selections. On February 7, 2019, Ms. Coelho rather than Ms. Gorrasi was chosen to be full Director, and on March 7, Ms. Gorrasi was not selected for Supervisory Human Resources Specialist (a team lead position). (ECF 21-13, Equal Employment Opportunity Counselor's Pre-Complaint Report at 3). She cited her academic degrees and her previous experience as a team lead (before her 2016 involuntary reassignment) as reasons why she should have been chosen. (*Id*.). She noted in particular that her national origin is a factor, because she is the only person of Italian/Argentinian descent in

consideration. (*Id*.). Ms. Gorrasi submitted her formal complaint (regarding the Director and team lead non-selections) on April 11 and amended it on July 22 to include her July 9 non-selection for the full Deputy Director position. (ECF 21-15, Exhibit N). The Agency acknowledged receipt of these claims on August 8, 2019. (ECF 21-16, Exhibit O).

Ms. Gorrasi filed this lawsuit on August 28, 2019, amending her complaint on December 9, 2019. She alleges race-based discrimination (Count I), harassment (Count II), and retaliation for prior EEO activity (Count III) in violation of Title VII; age discrimination, harassment, and retaliation in violation of the Age Discrimination in Employment Act (ADEA) (Count IV); and disability-based discrimination, harassment, and retaliation in violation of the Rehabilitation Act (Count V). (ECF 6).

## LEGAL STANDARDS

The defendants have moved to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A court considers only the pleadings when deciding a Rule 12(b)(6) motion. Where the parties present matters outside of the pleadings and the court considers those matters, as here, the motion is treated as one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997); *Paukstis v. Kenwood Golf & Country Club, Inc*., 241 F. Supp. 2d 551, 556 (D. Md. 2003). "There are two requirements for a proper Rule 12(d) conversion." *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 281 (4th Cir. 2013). First, all parties must "be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment," which can be satisfied when a party is "aware that material outside the pleadings is before the court." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253,

261 (4th Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious"). "[T]he second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first 'be afforded a reasonable opportunity for discovery.'" *Greater Baltimore*, 721 F.3d at 281.

Ms. Gorrasi had adequate notice that the defendants' motion might be treated as one for summary judgment. The motion's alternative caption and attached materials are in themselves sufficient indicia. *See Laughlin*, 149 F.3d at 260–61. Moreover, Ms. Gorrasi referred to the motion in her opposition brief as one for summary judgment.  If she had thought she needed additional evidence to oppose summary judgment, Rule 56(d) affords a plaintiff the opportunity to seek further discovery by filing an appropriate affidavit. *See* Fed. R. Civ. P. 56(d); *see also Greater Baltimore*, 721 F.3d at 281 ("[The defendant] took 'the proper course' when it filed the Rule 56([d]) Affidavit, 'stating that it could not properly oppose . . . summary judgment without a chance to conduct discovery.'") (citation omitted); *Laughlin*, 149 F.3d at 261 (refusing to overturn district court's grant of summary judgment on assertions of inadequate discovery when the nonmoving party failed to make an appropriate motion under Rule 56([d])). Ms. Gorrasi did not file a Rule 56(d) affidavit. Therefore, the court will consider the additional materials submitted by the parties and will treat the motion of the defendants as a motion for summary judgment.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*,

673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## ANALYSIS

### I.     The Agency's purported failure to cite evidence

In response to the Agency's motion, Ms. Gorrasi argues her claims should survive summary judgment because there is an absence of "any citation to affidavits, depositions or other reliable evidence or facts." (ECF 24, Pl.'s Mem. L. Opp'n Def.'s Mot. Dismiss Mot. Summ. J. at 10). This argument fails for two reasons. *See Y.B. v. Board of Educ. of Prince George's County*, 895 F. Supp. 2d 689, 700 (D. Md. 2012).

First, Ms. Gorrasi misunderstands the nature of the parties' burdens on summary judgment. Where the plaintiff has the ultimate burden of proof at trial, a moving defendant is required only to show the absence of a genuine dispute of material fact; it need not affirmatively present evidence to maintain a motion for summary judgment. *Y.B.*, 895 F. Supp. 2d at 700; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(B) advisory

committee notes (2010 amendment) ("And a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

Second, the Agency has included evidence in support of its motion for summary judgment. The motion's statement of facts is replete with references to EEO pre-complaint reports, formal complaints, an administrative law judge's decision, and the like. The administrative law judge's opinion, in turn, references the case's administrative record extensively. The Agency has set forth information in its motion indicating where in the underlying record there was support for those facts.

Indeed, it is Ms. Gorrasi who has failed either to offer documentary evidence or to file a Rule 56(d) affidavit[3] that she could not feasibly oppose summary judgment without more discovery. Her statement that she "cannot demonstrate the existence of disputed facts where no facts are asserted" is not a request for discovery but rather a choice not to respond to the facts laid before her.

## II.     Administrative Exhaustion

A plaintiff must exhaust her administrative remedies before filing a lawsuit under Title VII. *See, e.g.*, *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir.2005). Administrative exhaustion is "intended . . . to serve the primary purposes of notice and conciliation." *Id.* at 510.

---

[3] The Fourth Circuit places "great weight" on the affidavit requirement. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir.1996). Indeed, a failure to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Id*. At the same time, however, the Fourth Circuit has "not always insisted" on a formal affidavit and has excused non-compliance with Rule 56(d) "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir.2002). Ms. Gorrasi did neither.

It gives employers the "opportunity to voluntarily and independently investigate and resolve the alleged discriminatory actions, "thus preventing "later complaining of prejudice, since [the employer] has known of the allegations from the very beginning" and "initiates agency-monitored settlement," which is how most discrimination claims are resolved. *Id.* Accordingly, a complaint filed in court may raise "claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir.1996).

Title 29 of the Code of Federal Regulations sets forth the administrative process for filing discrimination complaints against the federal government. *See Zografov v. V.A. Medical Center*, 779 F.2d 967, 968–69 (4th Cir. 1985). To exhaust administrative remedies for a Title VII or Rehabilitation Act claim, a federal employee must first contact the employing agency's EEO counselor within 45 days of the allegedly discriminatory or retaliatory incident for an initial informal counseling session. 29 C.F.R. § 1614.105(a)(1). If informal counseling does not resolve the issue, the EEO counselor must inform the employee in writing of his or her right to file a formal EEO complaint with the agency. *Id.* § 1614.105(d). After receipt of that written notice, the employee has fifteen days to file a formal complaint with her employing agency. *Nielsen v. Hagel*, 666 F. App'x 225, 227 (4th Cir. 2016) (citing 29 C.F.R. §§ 1614.105(d), 1614.106(b)).[4] The agency then has 180 days to complete its investigation of the complaint and to attempt to resolve it. *See id.* at 228. A complainant may amend a complaint at any time prior to the end of the investigation to include "issues or claims like or related to those raised in the complaint" and, after requesting a hearing, may file a motion with the administrative judge to amend the

---

[4] Unpublished opinions are cited for the soundness of their reasoning, not for any precedential value.

complaint for any such issues. 29 C.F.R. § 1614.106(d). The agency shall acknowledge receipt of amendments in writing. *Id.* § 1614.106(e).

The Agency asserts two exhaustion defenses, which will be considered in turn.

>    A. *Involuntary reassignment*

First, the Agency argues that Ms. Gorrasi failed to exhaust all administrative remedies regarding her April 2016 involuntary reassignment to a non-supervisory role. (ECF 21-1, Def.'s Mot. Dismiss, Alternative, Mot. Summ. J. at 11). None of her three EEO complaints (including their amendments) raises the reassignment as a claim; its first mention is in her third complaint, dated April 11, 2019, in which she claimed that her March 7, 2019, non-selection for a supervisory position was due to retaliation for her ongoing EEO actions and to discrimination based on her religion (Roman Catholic), national origin (Hispanic), disability (hearing, vascular disease), age (66), and sex (female). (ECF 21-14, Exhibit M at 19). Only a hand-written note[5] — styled by Ms. Gorrasi as a May 2016 amendment to her first EEO complaint — memorializes this aspect of Ms. Gorrasi's claim. (ECF 11-2). The involuntary reassignment is never mentioned in the Agency's mid-July 2016 acknowledgment of her February 2016 and early-July 2016 amendments, nor does it appear as an "accepted issue" in the Administrative Judge's March 2019 decision on the complaint. (ECF 21-5, Exhibit D; ECF 21-6, Exhibit E).

Ms. Gorrasi counters that she has exhausted her administrative remedies for the involuntary reassignment, because the claim "is like or related" to those she alleged in her 2016 EEO complaint and because the Agency was on notice due to her May 2016 hand-written note. (ECF 24 at 3). She further claims that the Agency had investigated her involuntary reassignment,

---

[5] The note reads: "I Maria Rosria Gorrasi am requesting to amend my EEO Complaint HHS-NIH-OD-031-16 to include my involuntary reassignment from a supervisory to non-supervisory position. I was informed of this on April 19, 2016 by Ms. Chandler." (ECF 11-2).

a fact she attempts to substantiate with two quotes from a June 20, 2016, statement given to an

EEO Contract Investigator at NIH:

- Question 25 about her non-selection (or inability to compete for) for Acting Deputy Director, asking about co-workers receiving preferential treatment: "Lastly, it should be noted that NIH WRD management involuntarily gave me a new program to start from the ground up with no staff or supervisory status but Ms. Jessica Hawkins (White female) in WRD was recently given an established program (CIVIL) with a staff at the GS-14 level with supervisory status."

- Question 37 about her hostile work environment claim, asking whether there was additional alleged harassment after her manager yelled at her: "There have been no further incidents of yelling. But I believe my involuntary reassignment, effective May 1, 2016, was in direct response to my complaint concerning the harassment and my overall EEO complaint."

(ECF 11-3, Aff. at 7, 10).

Ms. Gorrasi's argument is unconvincing. First, the Agency's July 2016 acknowledgment

of her complaint and two amendments included an amendment submitted less than a week before

the acknowledgment letter. She had ample opportunity to confirm the Agency's receipt of the

involuntary reassignment amendment, but the record does not indicate that she did so. Second,

the quotes she cites above do not properly substantiate her claim that her involuntary

reassignment was investigated; rather, they simply reflect that she mentioned her involuntary

reassignment to an investigator in the course of examining other claims. Tellingly, her June 20,

2016, affidavit given to an EEO investigator did not list the involuntary reassignment as a claim

(instead listing only the proposed suspension, her non-selection for Acting Deputy Director, and

the hostile work environment claim), and Ms. Gorrasi added a footnote explicitly referring to the

Agency's acceptance of her first Amendment but not raising the issue of her May 2016

handwritten note. (*Id*. at 1, n.1).

Even after the investigation had concluded without explicitly addressing the involuntary

reassignment, Ms. Gorrasi could have filed a motion with the Administrative Judge, per 29

14

C.F.R. § 1614.106(d), to ensure that her May 2016 handwritten amendment was considered — a move that would have been logical given that she had received confirmation the Agency had accepted amendments she had filed before and after her May 2016 submission. The record does not indicate any such actions, an absence that undermines any argument that the involuntary reassignment worked its way through resolution or that she was somehow stymied by the process. The purpose of administrative exhaustion is to put the Agency on notice and to create opportunities for conciliation, and her May 2016 note fell short, only to be compounded by the fact that she subsequently ignored the involuntary reassignment as a claim through most of the rest of the process. While it may be reasonable to infer that Ms. Gorrasi did submit the handwritten note, Ms. Gorrasi has not shown that the EEO Office received the letter. *See Ngatia v. Dep't of Pub. Safety & Corr. Servs.*, No. CIV. WDQ-14-0899, 2015 WL 996585, at *8 (D. Md. 2015) (declining to infer that the EEOC received a letter requesting "an updated charge" when the plaintiff never received an updated charge in response, and therefore finding lack of exhaustion); *see also Dennis v. Cnty. Of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (racially discriminatory hiring, training, and promotion claims barred when EEOC charge only alleged discriminatory disciplining).

Even viewing the facts in the light most favorably for Ms. Gorrasi, the court concludes that her May 2016 attempted amendment (never again checked upon or referred to directly) does not constitute an exhaustion of her administrative remedies. Ms. Gorrasi's claims in Counts I, III, IV, and V — to the extent they rely on her involuntary reassignment — therefore will be dismissed for failure to exhaust her administrative remedies.

    B.  *Hostile Work Environment*

The Agency's second exhaustion defense is that Ms. Gorrasi only included hostile work environment as a claim in her first EEO complaint (the second and third being based solely upon allegedly discriminatory non-selection for various positions), and she should therefore be limited to the incidents from that complaint for her hostile work environment claims in Counts II, IV, and V. That is, the Agency asks that Ms. Gorrasi's hostile work environment claim be limited to her proposed suspension (April 2016), her non-selection for Acting Deputy Director (September 2015), her manager raising his voice at her (March 2016), and her non-selection as Deputy Director (June 2016). (ECF 21-1 at 11). This would exclude her non-selections for Acting Deputy Director (March 2018), Director (February 2019), Supervisory HR Specialist (March 2019), and Deputy Director (August 2019). (*Id.*).

The Agency's documentary submissions related to the second and third complaints reveal no mention of hostile work environment claims, and Ms. Gorrasi's response to the Agency's motion for summary judgment offers no evidence suggesting that her 2018 or 2019 EEO complaints included hostile work environment claims. In failing to respond to this argument, she concedes the point. *See Stenlund v. Marriott Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016). Ms. Gorrasi's hostile work environment claims (Counts II and, in part, IV and V) therefore will be limited to the incidents alleged in her 2016 EEO complaint.

### III. Discriminatory disparate treatment: Counts I and (in part) IV and V — Race-, Age-, and Disability-based Discrimination

Counts I and (in part) IV and V allege discriminatory disparate treatment based on race, age, and disability under Title VII, the Age Discrimination in Employment Act, and the Rehabilitation Act, respectively. This court will grant the Agency's motion for summary judgment as to these counts, as Ms. Gorrasi has failed to establish a prima facie case of discriminatory disparate treatment.

Where there is no direct evidence of intentional discrimination, plaintiffs may proceed with disparate treatment claims under the burden-shifting approach described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019). Under this framework:

(1) The plaintiff must first establish a prima facie case of employment discrimination;

(2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; and

(3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory.

*Id.*

Ms. Gorrasi alleges the Agency discriminated based on protected characteristics when it (a) declined to select her for various positions and promotions and (b) proposed suspending her. These issues will be considered in turn.

### A. *Non-selection as discrimination*

The core of Ms. Gorrasi's discrimination claim is that her non-selections for various positions were based on protected characteristics like her race, age, and disabilities (diabetes and hearing impairment).[6] Because she has failed to offer facts that would establish a prima facie showing of discriminatory non-selection, she fails the first step of the *McDonnell Douglas* burden-shifting framework.

---

[6] Those positions are Deputy Director (June 30, 2016), acting Deputy Director (March 12, 2018), Director (February 7, 2019), Supervisory HR Specialist (March 7, 2019), and Deputy Director (July 9, 2019).

To establish a prima facie case of discriminatory non-selection under Title VII, the plaintiff must allege sufficient facts to make plausible that:

> (1) she is a member of a protected group;
> (2) she applied for a specific position for which she was qualified; and
> (3) the circumstances of her non-selection give rise to an inference of discrimination.

*Freeman v. Beverly*, 2020 WL 2747392 at *4 (D. Md. May 20, 2020); *see Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004); *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 851 (4th Cir. 2001). In short, Ms. Gorrasi must allege facts showing that Defendants "failed or refused to hire her *because of* [her] race." *Id.* (quoting *McCleary-Evans v. Md. Dep't of Transp., State Hwy Admin.*, 780 F.3d 582, 585 (4th Cir. 2015) (emphasis in original)).

The plaintiff fails to make plausible that her non-selection gives rise to an inference of discrimination when she merely alleges that decisionmakers hired applicants outside her protected class. *McCleary-Evans*, 780 F.3d at 586. While this allegation is "*consistent* with discrimination, it does not alone support a *reasonable inference* that the decisionmakers were motivated by bias." *Id.* In short, such a complaint "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (referring to the federal pleading standard). And while a plaintiff need not properly assert a prima facie case of employment discrimination to survive a motion to dismiss, *Id.* at 584 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)), she certainly must when addressing the *McDonnell Douglas* first step at the summary judgment stage.

The Agency does not contest that Ms. Gorrasi is a member of a protected racial group, was over 40, and had certain qualified disabilities, and that she applied for various positions for which she was qualified enough to be considered. But the Agency argues that she has failed to

provide facts sufficient to make plausible that her non-selections give rise to an inference of discrimination — that is, that her non-selection was because of those protected characteristics.

For her part, Ms. Gorrasi states in her complaint:

- She has observed that Hispanic and African-American employees and older employees are routinely disfavored. (ECF 6 ¶¶ 15, 16).
- The Agency did not select her for various positions based on her race, age, and disability status, and the employees selected for those positions were "demonstrably less qualified." (*Id.* ¶ 43, 53, 54).
- The Agency proposed that she be suspended based on her race and national origin. (*Id.* ¶ 43, 53, 58).

The court addresses these statements one by one, deferring the proposed suspension to § V.A, *infra*. First, Ms. Gorrasi's observation about routine promotion practices at the Agency is entirely unsubstantiated and borders on conclusory. While this may have been sufficient to survive a motion to dismiss, Ms. Gorrasi's response to the Agency's summary judgment motion fails to supply any evidence or elaboration supporting this claim.

Second, Ms. Gorrasi alleges that the Agency declined to select her and instead selected other, less qualified, candidates because of Ms. Gorrasi's protected characteristics. Again here, Ms. Gorrasi has rested on the allegations of her complaint. She argues that an inference of racist and ageist discrimination arises from the fact that she lost to three younger, white selectees: Deborah Coelho (in September 2015, June 2016, and February 7), Jenna Moran (in March 2018), and Leia Butler (in March 2019).[7] Her complaint substantiates her claim that these candidates were "demonstrably less qualified" primarily by citing their years of service. For example, Ms. Gorrasi had served in human resource and employee relations for 40 years and in NIH Workforce Relations for 21 years, whereas Ms. Coelho had worked in the field for nine years

---

[7] The court can find in the record no concrete information about the individual chosen as Deputy Director in August 2019.

and at NIH Workforce Relations for three years. Ms. Gorrasi notes that she had a law degree and had graduated from the NIH Senior Leadership training program. (ECF 6 ¶¶ 23–24, 36). She further notes that the selecting official chose not to rotate the position — perhaps due to a desire to exclude Ms. Gorrasi from it for race-based reasons. (ECF 6 ¶¶ 21–22). She does not elaborate significantly in her response to the Agency's motion for summary judgment.

The Agency, meanwhile, argues that Gorrasi's claims are merely consistent with the possibility of bias but not sufficiently indicative of it. The Agency submits with its motion for summary judgment the Equal Employment Opportunity Commission's 2019 judgment in Ms. Gorrasi's first EEO complaint, which includes more facts about the Agency's reason for choosing Ms. Coelho for both the September 2015 and June 2016 positions. And Ms. Coelho chose not to rotate the acting deputy role because she sought continuity in the position after a period of significant staffing change. (ECF 21-6 at 5).[8]

Ms. Gorrasi's response to the Agency's motion for summary judgment offers no meaningful response to these facts and no explanation how, despite them, her non-selections in 2015 and 2016 give rise to an inference of discrimination. Nor does her response in opposition raise any facts that substantiate the allegation that her four 2018 and 2019 non-selections were based on race, age, or disability. At the summary judgment stage, the allegations alone are not enough. This court finds there is no genuine dispute of material fact as to these non-selections, and the Agency is entitled to judgment as a matter of law.

B.  _Proposed suspension as discrimination_

---

[8] The relevant facts are discussed _supra_ at 2–6.

Secondarily, Ms. Gorrasi includes her proposed suspension in her discrimination claim. Generally, to establish a prima facie case of discrimination based on race or national origin (Title VII), age (ADEA), or disability (Rehabilitation Act) the plaintiff must demonstrate that they experienced an adverse employment action. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd* 566 U.S. 30 (2012); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc), abrogated on other grounds by *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 570 U.S. 338, 360 (2013); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 n.17 (4th Cir. 2005).

The "typical" examples of an adverse employment action are "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion . . . ." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir.1999).[9] The improper considerations leading to that action may be merely a "motivating factor" of the adverse employment action in the Title VII context. *See* 42 U.S.C. § 2000e-2(m). Under the ADEA or Rehabilitation Act, however, a plaintiff must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action. *Gross. V. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009); *see Constantine*, 411 F.3d at 498 n.17.

Ms. Gorrasi's complaint alleges that her proposed suspension was discriminatory, though she offers no facts to substantiate this — only a conclusory allegation that the proposed suspension was intended to hurt her application for the Deputy Director position. (ECF 6 ¶ 31).

---

[9] Reassignment may also support a discrimination claim if the plaintiff can show it had some "significant detrimental effect." *Boone*, 178 F.3d at 256.

The Agency's summary judgment motion primarily argues that the proposed suspension was not actually an adverse employment action, because Ms. Gorrasi never served it.

Ms. Gorrasi's response to the Agency's summary judgment motion addresses the proposed suspension only as an instance of retaliation; she discusses only her non-selections (*see* § III.A, *supra*) when addressing her discrimination claim. (ECF 24 at 7–8). The court therefore defers detailed discussion of the nature of the proposed suspension and its status as an adverse employment action until § V.A, *infra*. For the reasons described more fully there, the proposed suspension is not an adverse employment action.[10] Ms. Gorrasi has therefore failed to make a prima facie showing of discrimination under any of the three statutes she cites. There is no genuine dispute as to any material fact, and the Agency is entitled to judgment as a matter of law as to the discrimination claims.

## IV.   Harassment via Race-, Age-, and Disability-based Hostile Work Environment — Counts II and (in part) IV and V

Ms. Gorrasi alleges that the Agency subjected her to race- (Count II), age- (Count IV), and disability-based (Count V in part) harassment by creating a hostile work environment and failing both to investigate and to take steps to prevent and correct the harassment. (ECF 6 ¶ 46).

To state a prima facie hostile work environment claim under Title VII, the ADEA, or the Rehabilitation Act the plaintiff must demonstrate:

(1) She is a qualified individual with a disability (for the Rehabilitation Act only);
(2) She experienced unwelcome harassment;
(3) The harassment was based on her race, age, or disability status;
(4) The harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and
(5) There is some basis for imposing liability on the employer.

---

[10] Discussion of the proposed suspension in the retaliation context will suffice, because Ms. Gorrasi fails even to meet the more lax standard offered by retaliation claims. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 70 (2006).

*Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998); *Evans v. International Paper Company*, 936

F.3d 183, 192 (4th Cir. 2019) (citing *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765

(4th Cir. 2003)); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001) (setting forth the

standard in the disability discrimination context and including the first element regarding having

a disability). A plaintiff must not only subjectively perceive the environment to be hostile or

abusive; the environment must be one that a reasonable person in the plaintiff's position would

objectively find hostile or abusive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

"In determining whether an actionable hostile work environment claim exists, we look to

all the circumstances," and, "[p]rovided that an act contributing to the claim occurs within the

filing period, the entire time period of the hostile environment may be considered by a court for

the purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,

116–17 (2002). "A hostile environment exists when the workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment." *Boyer-*

*Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (alteration and

internal quotation marks omitted). Among the factors a court should consider are "the frequency

of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or

a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Id.*

The Agency's motion for summary judgment argues that Gorrasi cannot make her prima

facie case for harassment for two reasons: causality and severity. To establish a discriminatory

harassment claim, a plaintiff "must do more than just claim membership in a protected class;

[she] must show that she was singled out for adverse treatment by the harasser because of her

membership in a group protected by Title VII." *Khoury v. Meserve*, 268 F. Supp. 2d 600, 612 (D. Md. 2003) (internal quotations omitted); *see also Gross*, 557 U.S. at 176 (requiring but-for causality under the ADEA); *Pueschel v. Peter*, 577 F.3d 558, 565 (4th Cir. 2009) (requiring but-for causality under the Rehabilitation Act).

Ms. Gorrasi notes several actions that she believes together constitute discriminatory harassment: the individual chosen for the Acting Deputy Director position was younger and Jewish. (ECF 11-3, Aff. ¶ 25). A supervisor "made public comments concerning the age of employees" and "publicly questioned why employees of a certain age do not retire." (ECF 6 ¶ 14). "Many years ago," a supervisor wrote in Ms. Gorrasi's record that Ms. Gorrasi had not completed her work duties because of her diabetes, and it is possible that certain non-specified human resources employees might have seen this note in her file. (ECF 11-3, Aff. ¶ 20). She is accused by unspecified individuals of being loud, because of her hearing impairment. (*Id.*). Her supervisor, Roman Lesiw, raised his voice at her. (ECF 6 ¶ 17).  A supervisor decided to keep one consistent acting Deputy Director rather than rotating the position between different employees. (*Id.* ¶ 22). Her supervisor proposed that she be suspended (*Id.* ¶ 27). She waited in "limbo" for some time, not knowing whether the suspension would be imposed. (ECF 11-3 ¶ 13). It was not imposed.

Ms. Gorrasi has failed to offer evidence that any of these instances of alleged harassment were motivated by her race, age, or disability status and would not have taken place but for her membership in those protected groups. Most do not rise to the level of harassment, and the one potentially plausible allegation — being yelled at by Mr. Lesiw — does not bear any indication of discriminatory animus. Instead, the Agency's evidence officers an entirely non-discriminatory motive: Mr. Lesiw's disappointment with Ms. Gorrasi's team's performance. Ms. Gorrasi's

response to the summary judgment motion offers no evidence that this is pretext to cover up racial, age-based, or disability-based discriminatory animus.

Second, the Agency argues Ms. Gorrasi cannot show that the alleged harassment was sufficiently severe to meet the standard. Being encouraged to retire, not being selected for a position, and Ms. Gorrasi's other alleged harms do not rise to the level of the abusive environment contemplated by the harassment provisions of Title VII, the Rehabilitation Act, and the ADEA. Even Mr. Lesiw's yelling, taken to be as frequent as Ms. Gorrasi alleges, does not rise to this level, especially when viewed with the additional context provided by Ms. Cabanayan and with the knowledge that management acted on the situation. To be sure, Mr. Lesiw's yelling may have been unpleasant and embarrassing. But there is no indication of regular slurs, epithets, physical threats, or other tactics of intimidation or humiliation. *See, e.g.*, *E.E.O.C. v. Central Wholesalers, Inc.*, 573 F.3d 167, 176–77 (4th Cir. 2009). Based on the record, a reasonable person would not characterize the alleged abuse as pervasive.

In Ms. Gorrasi's response to the Agency's motion for summary judgment, she failed to provide sufficient facts to make plausible her allegations that the Agency subjected her to a sufficiently severe race-, age-, or disability-based hostile work environment. Accordingly, the Agency will be awarded summary judgment as to the hostile work environment claims.

### V.      Retaliation: Counts III and (in part) IV and V

Counts III and (in part) IV and V allege retaliation in violation of Title VII, the Age Discrimination in Employment Act (ADEA), and the Rehabilitation Act, respectively. Ms. Gorrasi alleges that decisionmakers at the Agency knew of her prior EEO complaints (dating some years before the events of this case) and, as a result, proposed her suspension and chose not to select her for various positions.

A prima facie case of retaliation under Title VII, the Rehabilitation Act[11], and the

ADEA[12] "requires proof that:

> (1) the plaintiff engaged in protected activity,
> (2) [she] suffered an adverse employment action, and
> (3) there was a causal connection between the protected activity and the adverse
>     action."

*Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018) (setting forth the standard in the Title

VII context). If the defendant advances a lawful explanation for the alleged retaliatory action, the

plaintiff must demonstrate that the defendant's reason for taking the adverse employment action

was pretextual. *Adams v. Anne Arundel County Public Schools*, 789 F.3d 422, 429 (4th Cir.

2015) (citing *Laing v. Federal Express Corp.*, 703 F.3d 713, 719 (4th Cir. 2013)).

Title VII's requirement of an adverse employment action — both here and in the

discrimination context (*see* § III, *supra*) — "seeks to differentiate those harms that work a

'significant' detriment on employees from those that are relatively insubstantial or 'trivial.'"

*Adams*, 789 F.3d at 431  (citing *Burlington N.*, 548 U.S. at 63–64). A plaintiff's claim will not

succeed where she fails to link the alleged adverse employment action "to some material change

in the conditions of [her] employment." *Adams*, 789 F.3d at 431; *see also Terry v. Perdue*, 2021

WL 3418124 at *2 (4th Cir. 2021) (finding that a proposed but unserved suspension did not lead

to a harm material enough to qualify as an adverse employment action); *Ray*, 909 F.3d at 670.

### A.   *Retaliatory proposed discipline*

Ms. Gorrasi's complaint alleges that the Agency — motivated by her earlier

discrimination and retaliation complaints — proposed her suspension in order to diminish her

---

[11] The standard is the same in the disability context. *Hooven-Lewis v. Caldera*, 249 F.3d 259,
272 (4th Cir. 2001) (citing *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998)).

[12] The standard is the same in the age discrimination context under ADEA. *Causey*, 162 F.3d at
803.

candidacy for the Deputy Director position, an allegation she restates in her response to the Agency's motion for summary judgment. (ECF 6 ¶¶ 27, 30–31; ECF 24 at 7). Her response offers no facts or evidence that would substantiate this allegation. The Agency argues that the proposed suspension was not an adverse employment action, because Ms. Gorrasi never actually served it, diminishing its material adversity to a reasonable employee.  While Ms. Gorrasi alleges that it might have had an impact on her competitiveness for the Deputy Director position, she has failed to provide a factual basis for this assertion. A reasonable employee would not have viewed this proposed suspension — based on a specific incident of alleged inappropriate conduct but ultimately waived after a supervisor's review and not included in the permanent personnel file — as a materially adverse employment action. Ms. Gorrasi has failed[13] to state a prima facie case for retaliation in her proposed suspension.

B. _Retaliatory non-selection_

So, too, with her various non-selections: Ms. Gorrasi has failed to offer facts sufficient to support a causal connection between her protected EEO complaint activity and her non-selections for various activities. Further, even assuming she had done so, she has failed to offer facts that rebut the legitimate, non-retaliatory justifications (e.g., her poor interviews or her competitors' strong performance) for her non-selections.

As to her 2015 non-selection for the Acting Deputy Director position, Ms. Gorrasi's response to the Agency's motion fails to substantiate the allegation that her EEO complaints

---

[13] Even assuming that she met her prima facie burden, Ms. Gorrasi offers no evidence that the Agency's legitimate, non-discriminatory reason for her proposed suspension was pretextual. The Agency's exhibits reveal more of the facts surrounding the promotion: Ms. Gorrasi's manager believed — based upon a complaint from a colleague of Ms. Gorrasi's — that she had acted inappropriately, and he issued the suspension as a consequence. _See supra_ at 2–3. It was Ms. Gorrasi's burden at the summary judgment stage to offer facts showing that the Agency's justification was pretext, and she declined to do so.

caused the Agency not to select her for the various positions she sought. And she also fails to rebut the legitimate justification offered by the Agency. In the case of the 2015 Acting Deputy Director position, that justification was Ms. Coelho's "demonstrated leadership abilities," her "ability to work with challenging customers," and her "ability to be strategic and innovative [with] a Branch and Division wide view of our work and customers." (ECF 21-6 at 4–5).

Likewise for the Deputy Director position: Ms. Gorrasi expressed her belief that the interview process was "tainted" and that Management had given Ms. Coelho "unfair advantages" like selecting her for the Acting Deputy Director position earlier in 2015 — a process Ms. Gorrasi failed to undermine with evidence in her response to the Agency's motion. (ECF 11-3 at 14). Ms. Gorrasi failed to offer evidence that her positive self-assessments of her interview performance should call into question the interviewers' assessments of her candidacy. *See CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020) (A party's "self-serving opinion" cannot, "absent objective corroboration, defeat summary judgment.").

Having failed to offer facts to establish a prima facie case (e.g., showing a causal connection between her EEO activity and her non-selection) and having further failed to prove the Agency's justifications pretextual, Ms. Gorrasi has not met her burden, and the Agency's motion for summary judgment as to the retaliation claims will be granted.

## CONCLUSION

For the reasons stated above, the Agency's motion for summary judgment will be granted as to all claims. A separate Order follows.

9/29/2021                                                             /s/
Date                                                        Catherine C. Blake
                                                            United States District Judge